## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

Sungchan Song, Hanna Song, Karen Lucas-Barros, and Aseo Jo,

                Plaintiffs,

    vs.

Kensington International, Inc., John Gelin, Eyan Edwards, Rhina Hernandez, and The Business Buyers Club, LLC,

                Defendants.

Case No.

Judge:

Demand for Jury Trial

## COMPLAINT

## Table of Contents

I.   Introduction ................................................................................................................ 1

II.   Jurisdiction and Venue .............................................................................................. 5

III.   Parties ........................................................................................................................ 6

   A.   Plaintiffs .............................................................................................................. 6

   B.   Defendant Kensington ........................................................................................ 6

   C.   Other Defendants ............................................................................................... 8

IV.   Kensington's Fraudulent Inducement of Plaintiffs' Investments ...................................... 10

   A.   Defendants' Materially False and Misleading Statements Made in Solicitation Calls with Plaintiffs .......................................................................................... 10

   B.   Defendants' Materially False and Misleading Statements Made in a Marketing Brochure Sent to Plaintiffs ................................................................................ 13

   C.   Kensington's Misrepresentations Were Fraudulent and Plaintiffs Relied on Them in Deciding to Invest .............................................................................. 14

V.   Kensington's Breaches of Contract and Covenant of Good Faith and Fair Dealing............ 15

   A.   Kensington's Joint Venture Agreements with Plaintiffs .................................... 16

   B.   Kensington's Breaches of the Joint Venture Agreements .................................. 18

   C.   Terms of the Joint Venture Agreements Applicable to Kensington's Breaches............... 22

   D.   Kensington's Breaches of Its Additional Contracts with Rev. Jo...................... 23

VI.   Kensington's Breaches of Its Fiduciary Duty and Negligence .......................................... 24

VII.   Kensington's Fraudulent Statements After Plaintiffs' Investments.................................... 28

   A.   Kensington's Fraudulent Statements Regarding Properties ............................... 29

   B.   Kensington's Fraudulent Concealment Regarding Properties............................ 30

   C.   Kensington's Fraudulent Concealment Regarding Debt Service Payments..................... 32

VIII.   Plaintiffs' Damages Resulting from Their Investments in Kensington .............................. 36

    A.   Dr. Song's and Ms. Song's Damages ................................................................ 36

    B.   Lucas-Barros's Damages ............................................................................... 37

    C.   Rev. Jo's Damages ....................................................................................... 37

IX.    Alter Ego Allegations ......................................................................................... 37

X.    Causes of Action ................................................................................................. 39

XI.    Prayer for Relief ................................................................................................. 46

XII.    Jury Trial Demanded .......................................................................................... 47

## I.    Introduction

1.    This is a diversity action brought by California residents Dr. Sungchan Song, Hanna Song, Karen Lucas-Barros, and Rev. Aseo (Jon) Jo ("Plaintiffs"). Under New York State law, they allege claims of fraudulent inducement, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, negligence, fraudulent concealment, and equitable accounting against Kensington International, Inc., John Gelin, Eyan Edwards, Rhina Hernandez, and The Business Buyers Club, LLC ("Defendants").

2.    Kensington presented itself to Plaintiffs as a real estate investment firm offering joint venture investment partnerships to individual investors. John Gelin held himself out as its President and Chief Executive Officer and Eyan Edwards held himself out as its Vice President of Client Development.

3.    Kensington's investment proposition to Plaintiffs was that an individual investor, which it called a "client," would invest in Kensington in the form of a loan; Kensington would use the client's loan and its own outside financing to acquire residential properties in and around Newark, New Jersey; Kensington would then finance and manage the rehabilitation and resale of the acquired properties; any profits on the resold properties would be distributed amongst Kensington and the client; and Kensington would fully repay the client's loan within one year.

4.    Kensington portrayed itself to Plaintiffs as a low-risk proposition that would not even require them to invest their own money. Instead, it encouraged and helped Plaintiffs to borrow the funds that they, in turn, loaned to Kensington. To make Plaintiffs comfortable about the risks of this arrangement, Kensington contractually promised to make debt service payments on Plaintiffs' loans, fully repay their investments within one year, and reimburse them for any costs they incurred in connection with their loans. Kensington further backed its financial

1

obligations to Plaintiffs with promissory notes and personal guarantees executed by its main principals, Gelin and Edwards.

5.     During its solicitation calls and in its marketing brochures, Kensington represented to Plaintiffs, among other things, that it would use their investments to purchase properties in the Newark area, and it received opportunities to purchase around 12-13 such properties each month; it was in sound financial condition and had adequate "backup funds" to finance its share of property acquisition and rehabilitation costs and to fully repay Plaintiffs' investments; and its team was "comprised of contractors, real estate agents, brokers, seasoned investors" whose "combined experience" gave it an "intimate and detailed knowledge of market trends in the Greater New York area."

6.     Reasonably relying on these representations, Plaintiffs decided to invest with Kensington. With its assistance, Plaintiffs obtained substantial loans and, after paying loan origination and credit broker fees, disbursed the remainder to Kensington to acquire, rehabilitate, and resell Newark residential properties on their behalf.

7.     But Kensington's promises and representations were fraudulent. Gelin, previously convicted and imprisoned for his role in a multimillion-dollar mortgage fraud scheme, was reprising his role. Kensington either greatly exaggerated its ability to purchase properties in the Newark area or had no intention of making such purchases. Its access to outside financing was severely limited because of Gelin's poor credit and criminal record, and it lacked adequate cash on hand to reliably fund its operations and meet its financial obligations. Kensington's much-heralded team was mainly just Gelin and Edwards, with the help of Gelin's wife, Hernandez. They were not experienced real estate professionals with detailed knowledge of the New York

area market. They were smooth-talking schemers led by an experienced criminal with an intimate knowledge of how to commit fraud.

8.      To ensnare Plaintiffs, Defendants fabricated the false appearance of a professional, established, and financially sound real estate investment firm. They established the Kensington corporate entity in November 2017, the same month that it executed its first contract with Plaintiffs. They launched a website, which is now defunct. They created a marketing brochure full of misrepresentations that they sent to Plaintiffs. And they prepared a Joint Venture Agreement, complete with a promissory note and personal guarantee, that they executed with Plaintiffs. But the Joint Venture Agreements were merely props to complete the guise of a legitimate business and investment. As Defendants' conduct proved, they had no intention of keeping their promises and commitments.

9.      Having fraudulently induced Plaintiffs to borrow significant amounts of money to invest with Kensington, Defendants proceeded to systematically ignore and violate the core terms of the Joint Venture Agreements. Instead of purchasing properties on Plaintiffs' behalf in New Jersey, as the agreement expressly required, Defendants invested almost all of Plaintiffs' capital in and around Nashville, Tennessee, a market well beyond Kensington's purported experience and knowledge. Defendants also ceased making debt service payments on Plaintiffs' loans and failed to fully repay their investments within one year. Defendants' breaches of the Joint Venture Agreements placed Plaintiffs in the difficult position of either paying off the loans themselves or experiencing a severe impairment of their credit.

10.     Kensington's full repayments of the loans are overdue by more than two years. It has failed to provide a coherent explanation for any of its material breaches of the Joint Venture Agreements; failed to provide any accounting of how Plaintiffs' investments were used, such as

what properties were acquired on their behalf and the status of those properties; and failed to provide any schedule for full repayment of the loans and reimbursement of all interest and costs incurred by Plaintiffs. Indeed, Kensington has ignored Plaintiffs' numerous inquiries. Defendants continually acted in bad faith, depriving Plaintiffs of their right to receive the benefits provided by the Joint Venture Agreements.

11.     As a joint venture partner investing in properties on Plaintiffs' behalf, Kensington was a fiduciary of Plaintiffs and owed them the duties of care and candor. Utterly failing to discharge these duties, Defendants managed Plaintiffs' investments with gross negligence while either keeping Plaintiffs in the dark or actively misleading them about what was happening. Kensington ploughed Plaintiffs' capital into real estate properties located in the Nashville area without having adequate funds to satisfy its financial obligations to Plaintiffs. Before making these highly speculative investments far outside its supposed area of expertise, Kensington failed to apprise Plaintiffs of the risks and obtain their consent to venturing outside New Jersey.

12.     Even worse, Defendants recklessly relied on an unqualified and patently untrustworthy agent to manage its investments in Nashville, delivering Plaintiffs' capital into the hands of another shady ex-convict whom they brought into their scheme: Noel McFarland. After Edwards met McFarland at a bar, Kensington decided to invest in Nashville using him as an agent. McFarland quickly set up a limited liability company and Kensington sent him Plaintiffs' capital to invest. But Defendants failed to set up any controls to safeguard Plaintiffs' capital, rendering Kensington vulnerable to embezzlement. Later, Edwards came to believe that McFarland absconded with Kensington assets, including Plaintiffs' capital.

13.     To induce Plaintiffs not to seek enforcement of the Joint Venture Agreements, Kensington made numerous fraudulent statements to Plaintiffs about the status of the properties

acquired on their behalf and Kensington's failure to make debt service payments on Plaintiffs'

loans. These false excuses and obfuscations fraudulently concealed Kensington's lack of funds to

meet its financial obligations to Plaintiffs and its reckless management of investments in

Nashville. Defendants led Plaintiffs down this garden path until Plaintiffs realized they had been

deceived. Once they began to ask more probing questions, Defendants ignored them.

14.     As a result of Defendants' fraudulent conduct, breaches of contract, breaches of

fiduciary duty, and negligence, Plaintiffs have suffered economic damages in the several

hundreds of thousands of dollars.

## II.     Jurisdiction and Venue

15.     This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of

interest and costs, and the action is between citizens of different States. Each of the Plaintiffs

resides in California, and each of the Defendants resides in New York, except for Edwards,

whose last recorded residence was in New Jersey.

16.     Venue in this District is proper because many of the acts and transactions giving

rise to the violations of law alleged in this Complaint occurred in this District and most of the

Defendants reside in this District.

17.     Defendants Kensington, Gelin, and Edwards have consented to the personal

jurisdiction of this Court and waived any objections to jurisdiction or venue in New York.

Paragraph 13 of the Promissory Note attached as Schedule 1 of the Joint Venture Agreement that

Gelin and Edwards executed with Plaintiffs states:

> Debtor [Kensington] consents to and submits to jurisdiction over Debtor by any
> such court having jurisdiction over the subject matter, waives personal service of
> any and all process upon Debtor and consents that all such service of process may
> be by registered mail to Debtor at its address set forth above. Debtor further
> (a) agrees that any legal suit, action or proceeding arising out of or relating to this

Note will be instituted exclusively in the courts of the State of New York sitting in the County of New York, or any Federal court in such State, [and] (b) waives any objection which Debtor may have now or hereafter based upon forum non conveniens or to the venue of any such suit, action or proceeding[.]

## III. Parties

### A. Plaintiffs

18.     Plaintiff Dr. Sungchan Song is a physician who resides in California with his spouse, Plaintiff Hanna Song, a nurse. Pursuant to a Joint Venture Agreement with Kensington executed in November 2017, Dr. Song and Ms. Song together loaned $398,839 to Kensington as capital for purposes of real estate investment. To date, the Songs' total losses, including all unreimbursed out-of-pocket costs and liabilities, exceed $375,000.

19.     Plaintiff Karen Lucas-Barros is a nurse who resides in California. Pursuant to a Joint Venture Agreement with Kensington executed in December 2017, Lucas-Barros loaned $237,514 to Kensington as capital for purposes of real estate investment. To date, her losses, including all unreimbursed out-of-pocket costs and liabilities, exceed $218,000.

20.     Plaintiff Rev. Aseo (Jon) Jo is a Reverend who resides in California. Pursuant to a Joint Venture Agreement with Kensington executed in December 2017, Rev. Jo loaned $35,000 to Kensington as capital for purposes of real estate investment. To date, his losses, including all unreimbursed out-of-pocket costs and liabilities, exceed $13,000.

### B. Defendant Kensington

21.     Defendant Kensington International, Inc., is an active domestic business corporation incorporated in New York State. Established in November 2017, the firm is based in Brooklyn, New York. Kensington entered into Joint Venture Agreements with Plaintiffs in 2017.

22.     Kensington presented itself as a real estate investment firm offering joint venture investment partnerships to individual investors, which it called "clients." The proposition was

that a client would provide a portion of the capital that would go toward purchasing a residential property, while Kensington would pay the remaining purchase price. Kensington would solely be responsible for purchasing the property, rehabilitating it, and reselling it. Then Kensington would distribute any profits amongst itself and the clients who invested in the property.

23.     Kensington's website is no longer functional, but the Internet Archive's capture of the website on July 9, 2018, describes how the joint venture partnership works:

**WHAT WE DO.**

We partner with entrepreneurial minded individuals who want to embark on this journey with us to build an incredible Real Estate portfolio before the market changes again. We are the ultimate asset to investors because we do it all. From helping our partners secure nontraditional lines of credit for funding their deals, with nothing out of pocket, to locating undervalued properties, forming an equity partnership to purchase the properties, rehabbing, managing, and selling the properties. We keep your profits on auto-pilot, while you learn the business of successful real estate investing by shadowing us.

**THE AGREEMENT**

We begin with a joint venture agreement. Once the agreement is executed, we will help you secure a line of credit, which will help you contribute towards part of the purchase price of our target acquisition. All target acquisitions are purchased below market value, carefully screened and chosen by us to assure maximum profitability from resale. Kensington will finance the balance of the purchase price, and pay for any repairs or maintenance necessary to assure the acquisition can be sold at market value. Kensington will organize and manage all projects from start to finish.

**PROFIT**

Our Joint Venture Partners will receive a percentage of rent or lease, based on the terms agreed upon in the joint venture agreement. After the investment is sold, the sales profits will also be based on the terms agreed upon in the joint venture agreement. Our investment partners can earn anywhere from 20k-100k per deal, depending on the ARV, purchase price, and rehab costs of the target acquisition of course. Buy and hold projects are reserved for cash-flow laden commercial and multifamily properties. Investment partners may recommend projects, and if the numbers work, we'll do it.

*See* https://web.archive.org/web/20180709225203/http://kensingtoninternational.co/ (accessed on January 6, 2021).

24.     Although Kensington stated that clients could invest their own capital, its marketing brochure encouraged them not to use any of their own cash but to obtain financing through lines of credit ("One of the keys to investment success is having (or obtaining) access to other people's money. . . ."). Kensington even offered to help secure this outside financing for clients ("We handle every detail from securing financing for credit-based clients. . . .").

25.     To convince clients to invest borrowed money into this venture, Kensington proposed the investment as a one-year loan to the firm, backed by a promissory note and personal guarantee.

### C.     Other Defendants

26.     Defendant John Gelin resides in Brooklyn, New York. At the time of Plaintiffs' investments, he held himself out as Kensington's Chief Executive Officer. According to Edwards, Gelin is the sole owner of Kensington, controls its bank accounts, and is the "last say" on all its transactions. Among other things, Gelin communicated with Plaintiffs to arrange the disbursement of their capital to Kensington, and he negotiated the terms of Rev. Jo's settlement agreement. Gelin was a signatory of the Joint Venture Agreements, Promissory Notes, and Guarantees that Kensington executed with Dr. Song, Lucas-Barros, and Rev. Jo. And he was the signatory of the settlement agreement with Rev. Jo.

27.     Gelin has a criminal record for his role in a multimillion-dollar, sub-prime mortgage fraud scheme. In May 2009, he pleaded guilty and was sentenced in this District in *United States v. Aleksander Lipkin, et al.*, Case No. S2 06 Cr. 1179. According to a press release by the U.S. Attorney's Office, Gelin "was one of the investors who recruited and used straw buyers to purchase real estate and created fake bank statements and other fraudulent documents

to submit to lenders." *See* https://archives.fbi.gov/archives/newyork/press-releases/2009/nyfo060409.htm. He was sentenced to 36 months in prison, three years of supervised release, and was ordered to forfeit $1 million and pay approximately $11.6 million in restitution.

28.     Defendant Eyan Edwards's last recorded residence was in New Jersey. At the time of Plaintiffs' investments, he held himself out as Kensington's Vice President of Client Development. In this role, he made representations to Plaintiffs to induce them to invest in Kensington and representations to Plaintiffs over subsequent years regarding the status of their investments. Edwards was a signatory of the Joint Venture Agreements that Kensington executed with Lucas-Barros and Rev. Jo. He was also a signatory of the Promissory Notes and Guarantees that Kensington executed with Dr. Song, Lucas-Barros, and Rev. Jo.

29.     Defendant Rhina Hernandez, Gelin's spouse, resides in Brooklyn, New York. According to Edwards, she was a guarantor for the properties acquired by Kensington due to Gelin's poor credit and criminal record. Also, according to Edwards, she owns and controls Business Buyers Club, along with Gelin.

30.     Defendant The Business Buyers Club, LLC, is an active domestic limited liability company incorporated in New York State. Established in June 2015, Business Buyers Club is based in Brooklyn, New York. Business Buyers Club is owned and controlled by Gelin and Hernandez. Gelin holds himself out as its Chief Executive Officer. When Plaintiffs disbursed their loans to Kensington, they issued the checks to Business Buyers Club, as instructed by Kensington. In addition, Business Buyers Club is the owner of record for certain Kensington real estate properties. For example, real estate property acquired in New Jersey on behalf of Rev. Jo

is currently owned by Business Buyers Club. According to Edwards, Business Buyers Club is a subsidiary of Kensington.

**IV.     Kensington's Fraudulent Inducement of Plaintiffs' Investments**

31.     Kensington made several fraudulent representations that were intended to, and did, induce Plaintiffs to execute Joint Venture Agreements and invest borrowed capital in Kensington. Kensington made these misrepresentations either with knowledge of their falsity or with reckless disregard for the truth. Plaintiffs reasonably relied on these misrepresentations, which were material to Plaintiffs' decisions to invest in Kensington.

**A.     Defendants' Materially False and Misleading Statements Made in Solicitation Calls with Plaintiffs**

32.     In September 2017, Dr. Song had a telephone call with Edwards, who held himself out as Kensington's Vice President of Client Development. The purpose of the call was to convince Dr. Song to borrow capital and enter a joint venture partnership with Kensington, which would invest the capital in real estate properties. During this call, Edwards made several material representations to induce Dr. Song to invest.

33.     In October 2017, Lucas-Barros had a call with Edwards also for the purpose of soliciting her investment in Kensington. Rev. Jo also had a solicitation call with Edwards in late 2017.

34.     During the solicitation calls with Dr. Song, Lucas-Barros and Rev. Jo, Edwards said that Kensington would use the capital to purchase real estate properties in and around Newark, New Jersey, and that Kensington received opportunities to purchase around 12-13 such properties each month.

35.     The representations in the preceding paragraph were materially false or misleading when made. After Plaintiffs executed Joint Venture Agreements in November and

December 2017, Kensington never purchased any property in New Jersey on behalf of the Songs or Lucas-Barros. It purchased only one New Jersey property for Rev. Jo. Instead, Kensington invested almost all of Plaintiffs' capital in real estate located in and around Nashville, Tennessee.

36.     It is implausible that Kensington went from having 12-13 purchase opportunities in Newark in September 2017 to one opportunity over the next twelve months. There is no record of a sudden calamity that befell the Newark real estate market at the end of 2017 and throughout 2018, and Kensington did not cite any. At best, Kensington intentionally or recklessly exaggerated its ability to purchase properties in Newark. At worst, Kensington had no intention of using most of Plaintiffs' capital to make such purchases.

37.     In its communications with Plaintiffs, Kensington leaned heavily on the excuse that good purchase opportunities were generally harder to come by in the winter. This assertion is highly dubious, but even if it were true, it does not explain Kensington's failure. Kensington somehow found zero purchase opportunities in the Newark area in the winter of 2017-2018, zero in the spring of 2018, and only one in the summer of 2018. It was not until August 2018 that Kensington acquired a single Newark property for Plaintiffs. But in the same month, Kensington acquired properties in the Nashville area on behalf of the Songs and Lucas-Barros.

38.     Even if this winter excuse were valid and explained the failure to find purchase opportunities in New Jersey, Kensington's supposed experience in the market meant that it knew about the slowdown. Therefore, it was highly misleading for Edwards to tout 12-13 purchase opportunities per month when he knew that purchase opportunities would slow to a trickle—at best—during the winter months. Given that Plaintiffs' loans were of a 12-month duration, the fact that their capital would go unused for at least an entire season was highly material information that should have been disclosed.

39.     During the solicitation calls with Dr. Song, Lucas-Barros, and Rev. Jo, Edwards said that Kensington had adequate "backup funds" to finance its share of the property acquisition and rehabilitation costs and to make full repayment of the capital loaned by Kensington's clients.

40.     The representation in the preceding paragraph was materially false or misleading when made. Kensington failed to disclose that Gelin, its Chief Executive Officer and the person who controlled its funds and directed its investments, had poor credit and a prior conviction for his role in a multimillion-dollar mortgage fraud. Consequently, Kensington's access to outside financing was severely limited. Given Kensington's inability to finance the acquisition and rehabilitation of a single property within nine months after Plaintiffs executed their Joint Venture Agreements, Kensington evidently did not have adequate "backup funds" on hand.

41.     During the solicitation calls with Dr. Song, Lucas-Barros, and Rev. Jo, Edwards said that Kensington works with contractors that are "Section 8 housing approved," which allows Kensington to obtain units from the government at below market value with the expectation that Kensington would renovate these properties to be available back on the market.

42.     The representations in the preceding paragraph were materially false or misleading when made. On information and belief, Plaintiffs allege that Kensington was not involved in a government program with Section 8 contractors allowing Kensington to acquire properties at below market value. Unless this government program suddenly shuttered at the end of 2017, Kensington's failure to acquire a single property in New Jersey belies Edwards's statement. In a letter sent to Gelin and Edwards, Plaintiffs' counsel asked Kensington to provide any evidence of its relationship with "Section 8 housing approved" contractors. No such evidence was provided.

**B.** **Defendants' Materially False and Misleading Statements Made in a Marketing Brochure Sent to Plaintiffs**

43. Shortly after their solicitation calls, Edwards sent emails to Dr. Song, Lucas-Barros, and Rev. Jo attaching a Kensington marketing brochure. This brochure is attached to this Complaint as Exhibit 1.

44. The brochure stated that: "Our team is comprised of contractors, real estate agents, brokers, seasoned investors, and the combined experience of this group has afforded us intimate and detailed knowledge of market trends in the Greater New York area."

45. The representations in the preceding paragraph were materially false or misleading when made. Kensington misleadingly omitted that its team was headed by a convicted criminal fraudster. In addition, based on their communications with Defendants, Plaintiffs allege on information and belief that Kensington did not have a team of contractors, real estate agents, and brokers in the Greater New York Area. This so-called experienced team consisted mainly of Gelin and Edwards.

46. The brochure emphasized that Kensington was focused on properties in the Newark area, listing specific properties supposedly under contract that were all in or adjacent to Newark and citing articles about the desirability of the housing market in Newark.

47. The representations in the preceding paragraph were materially false or misleading when made. For the reasons stated in paragraphs 35-38 above, Kensington's failure to purchase more than a single property in the Newark area in twelve months shows that Kensington either intentionally or recklessly exaggerated its ability to purchase such properties or had no intention of using Plaintiffs' capital to do so. In addition, the brochure misleadingly omitted that purchase opportunities in the Newark area would slow to a trickle during the winter

months, a fact that Kensington knew due to its "intimate and detailed knowledge of market trends in the Greater New York Area."

48.     The brochure compared itself to Toll Brothers, a well-established and deeply funded housing development company. The only difference between Toll Brothers and Kensington, according to the brochure, was that Toll Brothers was in the luxury real estate market while Kensington was in the multifamily space.

49.     The representations in the preceding paragraph were materially false or misleading when made. The implication and effect of the brochure's comparison to Toll Brothers was to assure potential clients that while Kensington was smaller, it was well-established and in stable financial condition. For the reasons stated in paragraph 40 above, due in significant part to the poor credit and criminal record of its Chief Executive Officer, Kensington was not well-established and lacked adequate funds to meet its financial obligations to Plaintiffs.

**C.     Kensington's Misrepresentations Were Fraudulent and Plaintiffs Relied on Them in Deciding to Invest**

50.     At no time before Plaintiffs executed the Joint Venture Agreements did Kensington make any disclosures, orally or in writing, about any of the risks associated with Plaintiffs' investments in Kensington.

51.     As shown by Kensington's statements in its client solicitation calls and marketing brochure, Kensington's narrow focus on and expertise in the Newark area was central to its investment proposition. Yet, despite Kensington's purported concentration on the Newark area, intimate knowledge of the Newark market, and 12-13 buying opportunities per month, it inexplicably failed in achieving its central aim of acquiring Newark properties. If Kensington's representations to Plaintiffs were true, if Kensington had the ability and intention to invest in Newark properties, then it is impossible that Kensington was unable to acquire more than one

such property. There is no nonculpable explanation for this failure, showing that Kensington's misrepresentation of facts central to its investment proposition were fraudulent.

52.     Kensington's misrepresentations were intentional, and its duplicitous principals have shown very little regard for the truth. For example, while browsing Kensington's website in 2018, Dr. Song found an endorsement by him in which he declared his satisfaction with investing in Kensington. The endorsement played up the fact that he was a doctor. But he never made any kind of endorsement. Kensington's placement of a fake endorsement on its website demonstrates its willingness to lie to potential clients for financial gain.

53.     Plaintiffs, none of whom were experienced real estate investors, reasonably relied on Kensington's material misrepresentations in deciding to invest and place their trust in Kensington.

## V.      Kensington's Breaches of Contract and Covenant of Good Faith and Fair Dealing

54.     Kensington's fraudulent statements induced Plaintiffs to execute Joint Venture Agreements towards the end of 2017. Under the agreements, Plaintiffs made loans to Kensington for terms of one year as capital for investing in New Jersey real estate properties. Kensington secured these loans through promissory notes and personal guarantees. The agreements required Kensington to use Plaintiffs' capital and its own funds to acquire, renovate, and resell properties and then distribute any profits among the joint venture partners.

55.     Kensington drafted the Joint Venture Agreements and all incorporated documents, and Plaintiffs signed them without any additions or modifications.

56.     Kensington proceeded to flagrantly breach express terms of the Joint Venture Agreements by, among other things, investing Plaintiffs' capital in properties outside New Jersey and failing to fully repay Plaintiffs' investments within the one-year term.

**A.**     **Kensington's Joint Venture Agreements with Plaintiffs**

57.     Dr. Song signed a Joint Venture Agreement with Kensington in November 2017. The agreement expressly incorporates by reference and attaches a Promissory Note (Schedule 1) and Guarantee (Schedule 2). The agreement includes Exhibit B, which states the terms for the distribution of profits among the joint venture partners – 60% to Kensington and 40% to the Songs. The agreement also includes Exhibit D, which provides that for each acquired property, Kensington must take out a loan in an amount equal to at least 60% the purchase price, a loan for which only Kensington is responsible. The agreement signed by Dr. Song and incorporated documents are attached to this Complaint as Exhibit 2.

58.     The Joint Venture Agreement between Dr. Song and Kensington contains signature lines for Gelin and Eric Callahan (whose involvement in Kensington is unknown to Plaintiffs). The Promissory Note and Guarantee contain signature lines for Gelin and Edwards. Although Kensington never provided Dr. Song a copy of the agreement and incorporated documents signed by Gelin and Edwards, all parties to the agreement proceeded as if the documents had been fully executed. According to Edwards, Gelin signed the Joint Venture Agreement with Dr. Song.

59.     Although Ms. Song was not a signatory of the Joint Venture Agreement, the omission of her signature line was done only as a convenience, and Kensington knew that Ms. Song was also borrowing money to invest in Kensington under the terms of the agreement.

60.     The Songs' Joint Venture Agreement stated that they would lend Kensington up to $550,000. Kensington arranged for the Songs to retain a credit broker, which helped them secure 12 loans for a combined amount of $478,380 (eight loans of $330,000 for Dr. Song; four loans of $148,380 for Ms. Song). After origination fees and credit broker fees were subtracted, the Songs disbursed a total of $398,839 to Kensington for investing in New Jersey properties.

61.     Lucas-Barros signed a Joint Venture Agreement with Kensington in December 2017. The agreement expressly incorporated by reference and attached a Promissory Note (Schedule 1) and Guarantee (Schedule 2). The agreement includes Exhibit B, which states the terms for the distribution of profits among the joint venture partners – 60% to Kensington and 40% to Lucas-Barros. The agreement also includes Exhibit D, which provides that for each acquired property, Kensington must take out a loan in an amount equal to at least 60% the purchase price, a loan for which only Kensington is responsible. The Joint Venture Agreement, Promissory Note, and Guarantee were signed by Gelin and Edwards. The agreement signed by Lucas-Barros and incorporated documents are attached to the Complaint as Exhibit 3.

62.     Lucas-Barros's Joint Venture Agreement stated that she would lend Kensington up to $279,000. Kensington arranged for her to retain a credit broker, which helped her secure seven loans for a combined amount of $279,470 After origination fees and credit broker fees were subtracted, Lucas-Barros disbursed a total of $237,514 to Kensington for investing in New Jersey properties.

63.     Rev. Jo signed a Joint Venture Agreement with Kensington in December 2017. The agreement expressly incorporated by reference and attached a Promissory Note (Schedule 1) and Guarantee (Schedule 2). The agreement includes Exhibit B, which states the terms for the distribution of profits among the joint venture partners – 60% to Kensington and 40% to Rev. Jo. The agreement also includes Exhibit D, which provides that for each acquired property, Kensington must take out a loan in an amount equal to at least 60% the purchase price, a loan for which only Kensington is responsible. The agreement signed by Rev. Jo and incorporated documents are attached to the Complaint as Exhibit 4.

64. Although Kensington never provided Rev. Jo a copy of the agreement and incorporated documents signed by Gelin and Edwards, all parties to the agreement proceeded as if the documents had been fully executed.

65. Rev. Jo's Joint Venture Agreement stated that he would lend Kensington up to $100,000. Kensington arranged for him to retain a credit broker, which helped him secure one loan in the amount of $35,000. After origination fees and credit broker fees were subtracted, Rev. Jo disbursed the remainder to Kensington for investing in New Jersey properties.

**B.    Kensington's Breaches of the Joint Venture Agreements**

66. Section I, paragraphs 2-3 of the Joint Venture Agreement states that Kensington shall "use the Loan to acquire, renovate and dispose of 4 to 7 multifamily properties in New Jersey" (the "Purpose") and that "the Loan may only be used for the Purpose."

67. Kensington materially breached Section I, paragraphs 2-3 of the Joint Venture Agreement by failing to use the money loaned by the Songs and Lucas-Barros to acquire any multifamily property in New Jersey. Instead, according to its communications with Songs and Lucas-Barros, Kensington used the money to acquire properties in the Nashville area.

68. In August 2018, Kensington informed the Songs that it had acquired on their behalf a single-family home on Lawrin Park in Franklin, a city outside Nashville. Not only was the property located outside New Jersey, it was not even a multifamily property. Kensington failed to obtain the Songs' oral or written consent to this material deviation from the Joint Venture Agreement and informed them only after the fact. Despite repeated requests from the Songs throughout 2020, Kensington has refused to disclose the status of the property.

69. In August 2018, Kensington informed Lucas-Barros that it acquired on her behalf a single-family home on Strouse Avenue in Nashville. Not only was the property located outside New Jersey, it was not even a multifamily property. Kensington stated that it intended to

renovate the front house and add a house in the back, all of which would require at least six months to complete. Constructing a brand-new house is very different from rehabilitating an existing one. Moreover, August 2018 was just four months from the date that full repayment of her loan was due; it was too late to begin a six-month project with the funds. Kensington failed to obtain Lucas-Barros's oral or written consent to this material deviation from the Joint Venture Agreement and informed her only after the fact. She was subsequently told that renovations on the front house were completed and it was on the market. Despite repeated requests from Lucas-Barros throughout 2020, Kensington has refused to disclose the status of the property.

70.     In March 2019, Kensington informed the Songs and Lucas-Barros that it had acquired on their behalf 91 acres of undeveloped land in Murfreesboro, Tennessee, a city outside of Nashville. Kensington announced that "[t]he houses on this land will be divided up among many of you and we will make some really good monies on the project." Thus, not only was the property located outside New Jersey, it was not even a residential property to be rehabilitated. Kensington was using the money loaned by the Songs and Lucas-Barros to build new houses. Kensington failed to obtain the Songs' and Lucas-Barros's oral or written consent to this material deviation from the Joint Venture Agreement and informed them only after the fact. Despite repeated requests from the Songs and Lucas-Barros throughout 2020, Kensington has refused to disclose the status of the property.

71.     More egregiously, Kensington acquired the undeveloped Nashville land several months after full repayment was due on the Songs' and Lucas-Barros's loans. Thus, Kensington had cash on hand to make a partial or full repayment on the already overdue loans. Instead, Kensington sank the funds into property that was clearly outside the parameters of the Joint Venture Agreements.

72.     Section II, paragraph 2 of the Joint Venture Agreement states that Kensington shall "set aside at least ten percent (10%) of the Loan in a segregated bank account or subaccount owned and controlled by KENSINGTON or its subsidiary, for the sole purpose of making payments on the debt service of the Loan." Thus, Kensington was contractually required to make debt service payments on Plaintiffs' loans.

73.     Kensington materially breached Section II, paragraph 2 of the Joint Venture Agreement by ceasing to make debt service payments on Plaintiffs' loans in or about February 2019. Kensington also failed to inform Plaintiffs that it had ceased making debt service payments. Plaintiffs learned of this development when lending institutions informed them that debt service payments were overdue.

74.     Section II, paragraph 5 of the Joint Venture Agreement states that, "[n]otwithstanding anything to the contrary contained herein, the principal amount along with any and all interest accrued thereon, fees and any other lost shall be due on the one (1) year anniversary of the execution of this Agreement ('Maturity Date')."

75.     Kensington materially breached Section II, paragraph 5 of the Joint Venture Agreement by failing to make full repayments of Plaintiffs' loans, including all interest and fees accrued, by their one-year Maturity Dates—November 2018 for the Songs and December 2018 for Lucas-Barros and Rev. Jo. More than two years have now passed since the Maturity Dates, and far from making full repayment, Kensington has paid approximately $122,000 on the Songs' $398,839 loan and approximately $61,550 on Lucas-Barros's $279,470 loan. Plaintiffs are now left to make debt service payments out of their own pockets.

76.     Section II, paragraph 1 of the Joint Venture Agreement states that, "[n]otwithstanding anything to the contrary contained herein, KENSINGTON shall be

responsible for the repayment of the principal amount of the Loan as well as any interest, origination costs, late fees, or other fees and cost due thereon until the Loan has been repaid in full." Thus, Kensington is obligated not just to repay the loans and interest but also to reimburse Plaintiffs for any fees and costs, such as origination and credit broker fees, that they have incurred in connection with the loans.

77.     Kensington materially breached Section II, paragraph 1 of the Joint Venture Agreement by failing to fully reimburse Plaintiffs' fees and costs.

78.     Paragraph 4 of the Promissory Note states that "if Lender [*i.e.*, Plaintiffs] has not received the full amount of any payment by the date it is due, Debtor [*i.e.*, Kensington] shall pay a late charge on such overdue amount to Lender at a rate equal to the lesser of: (i) 6%, or (ii) the maximum rate allowable bylaw."

79.     Kensington materially breached Paragraph 4 of the Promissory Note by failing to pay any late charges on the overdue amounts owed to Plaintiffs. Given that more than two years have passed since the Maturity Dates, the late charges are substantial.

80.     Kensington's full repayments of Plaintiffs' investments are overdue by more than two years. It has failed to provide a coherent explanation for any of its material breaches of the Joint Venture Agreements; failed to provide any accounting of how Plaintiffs' capital was used, what specific properties were acquired, and the status of those properties; and failed to provide any schedule for full repayment of the loans and reimbursement of all interest, costs, and fees incurred by Plaintiffs. Indeed, Kensington has ignored Plaintiffs' numerous inquiries regarding the status of their loans and the properties that Kensington acquired on their behalf. Such conduct violated Kensington's implied covenant of good faith and fair dealing.

**C.     Terms of the Joint Venture Agreements Applicable to Kensington's Breaches**

81.     Section III of the Joint Venture Agreement states that Kensington is obligated to indemnify Plaintiffs and "hold them harmless from any loss, liability, claim, damage, cost or expense . . . suffered or incurred by [Plaintiffs] for or on account of or arising from or in connection with (i) any breach of any provision of this Agreement, and (ii) the Loan."

82.     Section VII of the Joint Venture Agreement states that Kensington's obligations under the agreement are binding on its "officers, directors, shareholders, employees, agents, assigns, affiliates, subsidiaries, subrogees and/or subrogors, in their capacities as such, and such individuals' and entities' successors." Thus, liability for Kensington's breaches of the agreement is not limited only to Kensington, Gelin, and Edwards. Liability also extends to Business Buyers Club, an affiliate of Kensington that is owned and controlled by Gelin and Hernandez. At Kensington's direction, when Plaintiffs disbursed their loans, they issued the checks to Business Buyers Club. In addition, Business Buyers Club is the owner of record for properties acquired by Kensington on its clients' behalf. Liability also extends to Hernandez, an agent of Kensington who, according to Edwards, was a guarantor for properties acquired by Kensington and is an owner of Business Buyers Club.

83.     Paragraph 12 of the Promissory Note states that "Lender [Plaintiffs] shall be entitled to recover from Debtor [Kensington] all costs and expenses incurred (including, without limitation, reasonable attorneys' fees) in exercising Lender's rights or enforcing Debtor's obligations under this Note[.]"

84.     Gelin and Edwards are each signatories of the Guarantees incorporated into the Joint Venture Agreements with Plaintiffs. By executing the Guarantees, Gelin and Edwards have provided their "personal guarantees as surety for the Loan[s] from [Plaintiffs] to [Kensington]."

Thus, they have committed their personal assets to satisfying Kensington's unpaid debt to Plaintiffs under the Joint Venture Agreements.

### D. Kensington's Breaches of Its Additional Contracts with Rev. Jo

85.     In August 2018, Kensington informed Rev. Jo that it had acquired a property on his behalf located on Verona Avenue in Newark and that it would be ready for sale in October 2018. Later, Kensington told Rev. Jo that completion of the rehabilitation was delayed due to contractor permitting issues.

86.     As the December 2018 Maturity Date for his loan approached, Rev. Jo demanded full repayment. Gelin refused to make full repayment, as required by the Joint Venture Agreement, but agreed to an alternative arrangement. In January 2019, Kensington and Rev. Jo executed a Termination Agreement that superseded the Joint Venture Agreement. Under the Termination Agreement, Kensington agreed to fully repay the $35,000 loan plus an 8% return.

87.     By May 2019, Kensington had paid nothing under the Termination Agreement, and Rev. Jo threatened litigation for breach of contract. Following negotiation, in June 2019, Kensington and Rev. Jo entered into a Settlement Agreement and Mutual General Release. Under the Settlement Agreement, Kensington agreed to pay $24,232.97 within 30 days. Gelin signed the agreement individually and as Kensington's Chief Executive Officer. The agreement is attached to this Complaint as Exhibit 5.

88.     Kensington failed to pay anything by the 30-day deadline. After Rev. Jo repeatedly urged Kensington to abide by the Settlement Agreement, Kensington finally paid $7,000 in September 2019 and another $6,000 in November 2019. Despite numerous demands by Rev. Jo, Kensington and Gelin have refused to pay the $13,232 balance. Thus, within a period of less than two years, Kensington materially breached three contracts that it had executed with Rev. Jo.

## VI.    Kensington's Breaches of Its Fiduciary Duty and Negligence

89.     Under New York law, members of a partnership or joint venture owe fiduciary duties to one another. In addition, an agent entrusted with the discretion to make investment decisions on behalf of a principal owes fiduciary duties to that principal. Kensington was a joint venture partner with Plaintiffs, and it was entrusted with the discretion to decide in which multifamily real properties in New Jersey to invest on behalf of itself and Plaintiffs. Therefore, a fiduciary relationship existed between Kensington and Plaintiffs.

90.     This relationship of trust and confidence required Kensington to exercise the utmost good faith and undivided loyalty toward Plaintiffs throughout the relationship. As a fiduciary, Kensington owed the duties of care and candor to Plaintiffs. Kensington utterly failed in discharging these duties.

91.     A fiduciary's duty of care is the duty to act as a reasonable and prudent person in a similar circumstance would act. Kensington breached this duty by carelessly using Plaintiffs' capital to make highly speculative investments outside its competence while using an unqualified and untrustworthy agent.

92.     At some point after Plaintiffs executed the Joint Venture Agreements, Kensington decided not to invest their capital in real estate properties in New Jersey. Instead, Kensington invested much of the capital in and around Nashville. In doing so, Kensington used Noel Burke McFarland, a resident of Tennessee, as its agent in the state.

93.     McFarland has been convicted multiple times for driving under the influence, along with convictions for driving with a revoked driver's license, evading arrest, and contributing to the delinquency of a minor. His latest convicted offense, in September 2012, was a felony habitual offender driving violation.

94.     Based on research done by Plaintiffs' counsel, McFarland is not an established real estate broker or investor. He does not have a LinkedIn page. He is not listed on any company website that could be found. Especially in view of this criminal record, there is virtually nothing to suggest that he is a qualified and trustworthy agent for Kensington's real estate investments using Plaintiffs' capital.

95.     According to an independent marketing contractor[1] who worked with Kensington and had frequent communications with Edwards, McFarland had no connection to Kensington before 2018. He became involved with Kensington after he met Edwards at a bar sometime that year. Based on this random casual encounter, and after conducting little or no due diligence, Edwards and Gelin decided to invest in the Nashville real estate market using McFarland as an agent. According to Edwards, McFarland was "running Tennessee" for Kensington, and, as such, Gelin sent money to McFarland.

96.     In an email sent to Dr. Song, Gelin offered the following explanation: "[Kensington's] properties in TN were owned by Southernland Partners. This company was formed when [Edwards] introduced me to his contact in TN [McFarland], and subsequently convinced me that the earning potential in TN was greater than NJ. Southernland partners was managed by Burke McFarland because it's a TN corporation, the properties are in TN, and Burke lives in TN."

97.     Indeed, publicly available information from the Tennessee Secretary of State shows that Southern Land Partners LLC was a Tennessee entity established in August 2018, the same month that properties were acquired in the Nashville area on behalf of the Songs and Lucas-Barros. It was administratively dissolved in October 2020.

---

[1] The independent marketing contractor is Ms. Song's brother, who worked part-time from home and had no knowledge of the fraud and other misconduct alleged in this Complaint.

98.     Kensington's own marketing materials said that its expertise was limited to "market trends in the Greater New York area." In diverting Plaintiffs' to Nashville, Kensington was flying blind into a new geographic market and relying on an unqualified agent with a criminal record whom Edwards had just met at a bar.

99.     Between 2018 and March 2019, Plaintiffs received communications from Kensington informing them that their capital had been invested in single-family homes and 91 acres of undeveloped land in the Nashville area. Kensington failed to seek consent from Plaintiffs before making these investments and informed them only after the transactions had occurred. Nor did Kensington disclose to Plaintiffs that it was using McFarland as an agent, that it appointed him to run its investments in Tennessee, and that it sent Plaintiffs' capital to him.

100.     Worse, Kensington recklessly managed the properties in a way that was far from being in the best interests of Plaintiffs.

101.     Kensington informed the Songs in August 2018 that it had acquired on their behalf a single-family house on Lawrin Park in Franklin, Tennessee. In April 2019, Kensington claimed that the house was under contract to be sold. But then the closing was indefinitely delayed because the buyer was going through a divorce. Finding another buyer would have been the reasonable and prudent course, especially given that the Maturity Date of the Songs' loan had passed. Inexplicably, however, Kensington waited for this buyer to finalize her divorce. In August 2019, one year after the Songs were first informed about the property, Kensington notified them that it had put the property back on the market, after waiting the entire summer for the buyer's divorce to be finalized. Since August 2019, the Songs have not been able to learn from Kensington the status of the property.

102.     Kensington informed Lucas-Barros in August 2018 that it had acquired on her behalf a single-family house on Strouse Avenue in Nashville. This was four months before the Maturity Date of her loan. Using the cash on hand to make a partial or full repayment of the loan or at least investing the cash in a project with a short turnaround would have been the reasonable and prudent course. Instead, Kensington sank the money in a rehabilitation and new home construction project that would take at least six months to complete, not counting the time to sell the property. But even that Kensington could not handle. Five months later, in January 2019, Kensington notified Lucas-Barros that renovations of the front house were only "halfway complete" and "[w]e are expecting to acquire the remaining funds to complete the rehab process next week." Thus, Kensington acquired the property using Lucas-Barros's capital without even having adequate funds to complete the rehabilitation of the front house. Eventually, she was told that renovations on the front house were completed and it was on the market. But since then, she has not been able to learn from Kensington the status of the property.

103.     Kensington informed the Songs and Lucas-Barros in March 2019 that it had acquired on their behalf 91 acres of undeveloped land in the Nashville area. This purchase was made three to four months after the Maturity Dates of the Songs' and Lucas-Barros's loans. Using the cash on hand to make a partial or full repayment to Plaintiffs would have been the reasonable and prudent course. Inexplicably, however, Kensington ploughed this cash into a highly speculative purchase of undeveloped land located outside its geographic area of expertise. And Kensington announced that it was going to build houses on this land—which was far beyond its competency. Kensington later explained to the Songs that it planned to refinance the land "to enable cash out exit strategies." But this plan made no sense, raising the question of why

Kensington purchased the land in the first place. Since March 2019, Plaintiffs have not been able to learn from Kensington the status of the property.

104.　　Subsequent events show that Kensington failed to adequately monitor McFarland or implement effective internal controls over its agent. According to the same independent contractor who worked with Kensington, Edwards stated that he believed McFarland had absconded with assets that Kensington had entrusted with him. Edwards also stated that he would go to Nashville to investigate the matter. Such a development explains why Kensington has steadfastly refused to inform Plaintiffs what has happened with their money or the Nashville properties. By blindly trusting a shady character such as McFarland to invest Plaintiffs' capital in Nashville real estate without closely monitoring him, Kensington acted unreasonably and imprudently.

105.　　Kensington breached its duty of care to Plaintiffs by using an unqualified and patently untrustworthy agent, investing in a geographic area outside its expertise, mismanaging Plaintiffs' capital and the properties acquired, and failing to monitor and control its agent.

**VII.　　Kensington's Fraudulent Statements After Plaintiffs' Investments**

106.　　By August 2018, Kensington had materially breached the Joint Venture Agreements by investing the Songs' and Lucas-Barros's capital outside New Jersey. By the end of 2018, Kensington had further breached the Joint Venture Agreements by failing to make full repayments on the Songs' and Lucas-Barros's loans by the Maturity Dates. And then in early 2019, Kensington stopped making debt service payments on their loans, also in contravention of the Joint Venture Agreements.

107.　　Kensington's breaches had placed the Songs and Lucas-Barros, none of whom were experienced real estate investors, in a very difficult position. Although Kensington was

supposed to make full repayment of their loans, Kensington had invested their capital, without their consent, in properties located in Tennessee.

108.     To induce the Songs and Lucas-Barros to make debt service payments on their loans when Kensington stopped doing so, and to reassure them so that they would not demand full repayment of their loans and seek to enforce the Joint Venture Agreements, Kensington made a series of fraudulent statements. They include Kensington's misrepresentations about the status of certain properties and numerous false excuses and justifications for Kensington's persistent failure to make debt service payments on the loans. Kensington led the Songs and Lucas-Barros along the garden path with these misrepresentations until it became finally clear that Kensington was lying to them.

### A.     Kensington's Fraudulent Statements Regarding Properties

109.     Even before the Maturity Date of the Songs' loan, Kensington began stringing them along with falsehoods. In June 2018, Kensington sent the Songs a Freedcamp message[2] that they were getting a property on Leslie Street in Newark: "[W]e just picked up the deed for this property and just put in an application to refinance the original lenders off of this property. Once the application has been approved then we will get a commitment lender from our lenders for this property." In September 2018, Kensington sent another Freedcamp message stating that "[o]nce the construction loan is approved, the rehab work will begin on this property!" Since then, the Songs inquired repeatedly about the property, never receiving any response.

110.     Kensington's statements in the preceding paragraph about the Leslie Street property were materially false or misleading when made. According to publicly available

---

[2] Kensington generally used a web-based project management program, Freedcamp, to send messages to clients about properties acquired on their behalf. The messages, which were sent to the email accounts of its clients, generally did not identify the individual sender.

records, there was no sale of the Leslie Street property between March 2015 and April 2019. Thus, Kensington could not have "picked up the deed" in June 2018 as represented in its message. Relying on these misrepresentations, the Songs were reassured that Kensington was seeking to acquire New Jersey properties on their behalf, as required by the Joint Venture Agreement.

111.    In August 2018, Kensington acquired single-family homes in the Nashville area for both the Songs (Lawrin Park) and Lucas-Barros (Strouse Avenue). Six months later, the properties remained unsold. To reassure the Songs and Lucas-Barros, in March 2019, Kensington sent them a Freedcamp message stating: "We are also happy to announce our partnership with the Television show 'Flip or Flop Nashville' on HGtv. This means that every single property that we purchase & rehab in Nashville, will end up on TV."

112.    Kensington's statements in the preceding paragraph were materially false or misleading when made. On information and belief, Plaintiffs allege that Kensington had no partnership with HGTV. Relying on these misrepresentations, the Songs and Lucas-Barros were reassured that, even though Kensington violated the Joint Venture Agreements by acquiring properties outside New Jersey, the television exposure would lead to the properties being sold and repayment of their loans.

### B.    Kensington's Fraudulent Concealment Regarding Properties

113.    When Kensington made statements regarding the properties it acquired on its clients' behalf, it had a duty to speak truthfully and completely about such matters. In addition, because Kensington had a fiduciary relationship with its clients, it had a duty to disclose material facts about its financial condition and the Tennessee investments.

114.    In August 2018, Kensington sent Lucas-Barros a Freedcamp message telling her that she was getting the Strouse Avenue property. The message stated that the Nashville market

is "extremely hot," and "no property has been on the market for more than 3 days in the last 3 years." In a separate message, Kensington also noted that the recording documents for the purchase "says 'Southern Land Partners'. Southern Land Partners, LLC is a Kensington International subsidiary that operates solely in Nashville."

115.    While making the statements in the preceding paragraph, Kensington concealed that: (a) Southern Land Partners was a Tennessee entity established in August 2018, the very month that Kensington acquired the Strouse Avenue property, and the entity was affiliated with McFarland; (b) Kensington had appointed McFarland, an unqualified, untrustworthy agent with an extensive criminal record whom Edwards met at a bar, to run Kensington's investments in Tennessee; and (c) Kensington had sent Lucas-Barros's capital to McFarland without adequate safeguards. Kensington's had a duty to disclose this material information but failed to do so. Relying on Kensington's fraudulent concealment, Lucas-Barros was reassured that the investment on her behalf was less risky than it really was.

116.    In March 2019, Kensington informed the Songs that it had acquired 91 acres of land in the Nashville area and was "currently refinancing the property to enable cash out exit strategies for several of you, our investing partners." That same month, Kensington sent a Freedcamp message to the Songs and Lucas-Barros stating: "Kensington International, Artist Financial Program, & our Sister company - Southern Land Partners, are happy to announce[d] that we have just purchased over 91 Acres of land in Murfreesboro, TN (about 25 minutes outside of Downtown Nashville). The houses on this land will be divided up among many of you and we will make some really good monies on the project."

117.    While making the statements in the preceding paragraph, Kensington concealed that: (a) Southern Land Partners was not an established real estate investment firm but was

hurriedly established by McFarland in August 2018 for the purpose of investing Plaintiffs'
capital; (b) Kensington had appointed McFarland, an unqualified, untrustworthy agent with an
extensive criminal record whom Edwards met at a bar, to run Kensington's investments in
Tennessee; (c) Kensington had sent the Songs' and Lucas-Barros's capital to McFarland without
adequate safeguards; (d) Kensington had ploughed their capital into undeveloped land even
though Kensington lacked the funds to finance rehabilitation and development projects or to
make debt service payments on their loans; and (e) due to Gelin's poor credit and criminal
record, Kensington's access to outside financing was extremely limited. Kensington's had a duty
to disclose this material information but failed to do so. Relying on Kensington's fraudulent
concealment, the Songs and Lucas-Barros were reassured that the investments on their behalf
were less risky than they really were.

### C. Kensington's Fraudulent Concealment Regarding Debt Service Payments

118.    Starting in or about February 2019, Kensington stopped making debt service
payments on Plaintiffs' loans. Naturally, over the ensuing months, the Songs and Lucas-Barros
sent many emails and text messages to Kensington urging it to make the debt service payments,
as required by the Joint Venture Agreements. And the Songs sought reimbursement for the debt
service payments they made when Kensington ceased doing so.

119.    In response to Plaintiffs' many communications about debt service payments,
Kensington followed a consistent pattern: ignore the inquiry at first, make a false excuse for the
delayed payment, ask the client to resubmit the payment information, and promise payment at
some later date. When the payment was not made at the promised time or less than the promised
amount, and Plaintiffs inquired, the pattern started again.

120.    Kensington's statements to Plaintiffs about debt service payments were rife with
excuses and obfuscation—wholly contrary to Kensington's duty to disclose arising from its

fiduciary relationship with Plaintiffs. To repel Plaintiffs' inquiries and suspicions, Kensington blamed, among other things, banking and local government snafus that delayed some refinancing. This misdirection concealed the central problem: Kensington lacked the funds to comply with its contractual obligations to Plaintiffs.

121. Below is just a sample of Kensington's communications, which continued in this vein throughout 2019:

      a.      June 2019 email from Edwards to Dr. Song:

I am in the process of submitting this request.
We found out the reason why the refinances have been taking so long...
The government said "it slipped through the cracks"... which is ridiculous.
So, we are on them about getting the inspector in there this week.
With that said, we will begin to start wiring you monies this week and hope to have this entire amount rectified with in the next 2 weeks.

      b.      June 2019 email from Edwards to Lucas-Barros:

[W]e had the banking situation that led to a frozen account, that fed all the sub accounts, including yours, which we just resolved. Because of money being held longer than planned, in escrow, almost occurring simultaneously with the banking error, we now have to have a delicate balancing act between renovating our existing assets in order to earn the money to fulfill our contractual obligations, and catching upon debt services.

      c.      July 2019 email from Edwards to Dr. Song:

[W]e are waiting on this Refinance to go through in order for us to be able to cover all of these bills. We actually found out last week that the local government said our refinance "Slipped through the cracks". This slipping through the cracks should have been found out atleast a month ago. Which I am very annoyed about because it has caused a blow to all of us financially, as we have been personally covering all 50+ of our clients debt out of our own pockets for the last few months. So, it has been crazy for all of us and I know it's annoying.

However, we should be able to get on top of this with in the next week or so. I wouldn't advise you to keep using your own money as we will cover everything. I will see how much we can get done this week, but I am thinking with in the next 1 – 2 weeks we should in position to start correcting all of these issues. If the banks call, let them know this.

d.      July 2019 email from Edwards to Dr. Song:

The good news is that I am confident that the banking issue will be resolved with in the next 2 - 4 weeks.
We have other's monies coming in outside of the refinance that we are waiting on.
Once that is in, regardless of the refinance, you will be made current.

e.      July 2019 email from Edwards to Lucas-Barros:

We are happy to announce that our banking issue looks like it is finally starting to clear up and some of the funds we were looking for, look like they will be rolling in starting next week.

Which means, we will be able to get some, if not all, of your loans current and up to speed.

122.    Meanwhile, in July 2019, when Rev. Jo demanded that Kensington pay the settlement amount of $24,232.97 that was already overdue, Gelin revealed that Kensington could not pay it. That month, he sent Rev. Jo an email stating: "I am writing to request an extension to payout your client. We were relying on revenue from a closing that was supposed to take place at the end of June, but do to a bad initial appraisal, the deal has ended up being delayed."

123.    Kensington was unable to pay a debt of less than $25,000, an amount that should have been trivial for a real estate investment firm. In the following month, in an email to Rev. Jo, Edwards expressly confirmed its lack of funds: "The reason why we haven't given [you] the money is not because we are trying to avoid you and trying to rip you off... its because we don't have the money at the moment."

124.    In its communications with the Songs and Lucas-Barros, including but not limited to those included in paragraph 121 above, Kensington fraudulently concealed that: (a) Kensington lacked any "backup funds," which Edwards originally touted to Plaintiffs, to finance its rehabilitation and development projects or to make debt service payments on Plaintiffs' loans; (b) due to Gelin's poor credit and criminal record, Kensington's access to outside financing was

extremely limited; (c) Kensington had appointed McFarland, an unqualified, untrustworthy agent with an extensive criminal record whom Edwards met at a bar, to run Kensington's investments in Tennessee; (d) Kensington had sent the Songs' and Lucas-Barros' capital to McFarland without adequate safeguards; (e) Kensington had failed to monitor its agent, rendering it vulnerable to embezzlement, and believed that its agent had absconded with assets; and (f) despite executing Promissory Notes and Guarantees, Gelin and Edwards either lacked the personal assets to repay the Songs' and Lucas-Barros's investments or had no intention to back their contractual obligations with personal assets. Kensington had a duty to disclose this material information but failed to do so. Due to this fraudulent concealment, the Songs and Lucas-Barros were reassured and chose not to seek enforcement of the Joint Venture Agreement.

125. When the COVID-19 pandemic began in early 2020, Kensington seized on it as an excuse to delay making any debt service payments.

126. The last substantive update that the Songs and Lucas-Barros received regarding the Tennessee properties was an email sent by "KI Admin" in June 2020:

**OUR NEXT STEPS:**

1. **Leave In Nashville -** We are already on the road. Our team in Nashville said they need approximately 10 days in order to give us an exact date of completion. This date of completion will be very soon. Meaning, we will not be leaving Nashville until the entire issue is resolved. So, sometime within the next 14 days we will respond with dates, pics, etc.

2. **Refinance -** After the renovations are complete, the refinance will occur. The refi process, in Nashville, ordinarily takes no more than 7 - 10 business days from the completion date. We haven't heard that anything has changed, so we will maintain the same date. This refi will include a refi of the properties and then a second line of credit to ensure the funds we need to cash you out. This total process should not take more than 2 weeks from the date of completion.

3. **Cash Out -** Once all of the previous actions are executed, we will go through any card payments and you will be receiving cash back from these opportunities.

127.     In making the statements in the preceding paragraph, Kensington continued to fraudulently conceal the material information set forth in paragraph 124 above. As with Kensington's many, many failed promises before, there was no refinancing and Kensington did not "cash out" the Songs and Lucas-Barros.

128.     By the fall of 2020, the Songs began threatening litigation if Kensington did not make significant progress toward full repayment of their loans. In addition, the Songs raised the prospect that Kensington had engaged in fraud. They invited Kensington to dispel this suspicion by giving an accounting of how their capital was used and the status of all properties acquired on their behalf. Kensington neither made any payments nor provided an accounting.

## VIII.   Plaintiffs' Damages Resulting from Their Investments in Kensington

129.     Kensington's fraudulent inducement, breaches of contract, breaches of the covenant of good faith and fair dealing, breaches of fiduciary duty, negligence, and fraudulent concealment caused Plaintiffs to suffer substantial financial losses in the form of massive unpaid debts or depletion of savings to pay off massive debts, along with interest, fees, and other costs.

### A.     Dr. Song's and Ms. Song's Damages

130.     Because Kensington failed to inform the Songs that it had ceased making debt service payments, they had two 30-day late payments recorded in their credit report. Consequently, Kensington's carelessness negatively impacted the Songs' credit score.

131.     On the Songs' loans, Kensington has made total debt service payments of approximately $122,000, which is only 25.5% of the $478,380 that the Songs borrowed. Meanwhile, to avoid further impairing their credit, the Songs have been forced to pay more than $250,000 on their loans. They have approximately $125,000 in loans that remain outstanding. In addition, they have incurred origination and credit broker fees of $79,541.

132.    Most of the Songs' debt service payments have come out of their retirement savings, causing them significant distress about their future. In his many emails and text messages urging Kensington to make debt service payments, Dr. Song informed Kensington that he and his spouse were virtually depleting their retirements accounts.

**B.    Lucas-Barros's Damages**

133.    On Lucas-Barros's loans, Kensington has made total debt service payments of approximately $61,552, which is only 22.0% of the $279,470 that she borrowed. Lucas-Barros has largely been unable to step in to make those payments, resulting in a severe impairment of her credit and debt collection efforts by her lenders. She has approximately $214,396 in loans that remain outstanding. In addition, she has incurred origination and credit broker fees of $41,956.

134.    Lucas-Barros's massive outstanding debt, her lenders' debt collection efforts, and the severe impairment of her credit have caused her extreme anxiety. In her many emails and text messages urging Kensington to make debt service payments, Lucas-Barros informed Kensington of her financial situation.

**C.    Rev. Jo's Damages**

135.    As explained above, Kensington and Rev. Jo executed a Settlement Agreement, which Kensington has breached. Under the agreement, Kensington still owes him a balance of $13,232.

**IX.    Alter Ego Allegations**

136.    Gelin and Hernandez own one hundred percent of Kensington and Business Buyers Club.

137.    Kensington and Business Buyers Club are close companies.

138.    Upon information and belief, Gelin and Hernandez exercise complete control over Kensington and Business Buyers Club. Gelin held himself out as Kensington's Chief Executive Officer and executed legal documents under that title.

139.    There is a unity of interest and ownership between Gelin and Hernandez on the one hand, and Kensington and Business Buyers Club, on the other hand, such that the requisite degree of individuality and separateness among these Defendants, and each of them, have ceased, and that Gelin and Hernandez are the alter egos of Kensington and Business Buyers Club, and these entities are the alter egos of one another.

140.    Plaintiffs are informed and believe that:

a.    Gelin and Hernandez have held themselves out as the owners of Kensington and Business Buyers Club;

b.    Gelin has held himself out as the Chief Executive Officer of both Kensington and Business Buyers Club;

c.    Gelin and Hernandez have completely controlled, dominated, managed, and operated Kensington and Business Buyers Club for their sole and exclusive benefit;

d.    Gelin and Hernandez have controlled and operated Kensington and Business Buyers Club as devices to avoid individual, agency, and *respondeat superior* liability;

e.    Gelin and Hernandez have failed to maintain the requisite degree of separateness with Kensington and Business Buyers Club and have failed to observe requisite corporate formalities; and

f.    Gelin and Hernandez have intermingled Kensington's assets, Business Buyers Club assets, and their personal assets.

141.    Adherence to the fiction of the separate existence of Kensington and Business Buyers Club as entities distinct from Gelin and Hernandez would permit an abuse of the company privilege, sanction fraud, and promote injustice.

## X.    Causes of Action

**Count I**
**Fraudulent Inducement**
**All Defendants**

142.    To induce Plaintiffs' investments, in September and October 2017, Kensington made several representations during solicitation calls and in a marketing brochure: (a) it would use Plaintiffs' capital to purchase real estate properties in and around Newark, New Jersey, and received opportunities to purchase around 12-13 such properties each month; (b) it was in sound financial condition and had adequate "backup funds" to finance its share of property acquisition and rehabilitation costs and to make full repayment of loans by its clients; (c) it worked with contractors that were "Section 8 housing approved," allowing it to obtain units from the government at below market value; and (d) its team was "comprised of contractors, real estate agents, brokers, seasoned investors," and its "combined experience" gave it an "intimate and detailed knowledge of market trends in the Greater New York area."

143.    Kensington's representations were materially false or misleading when made because: (a) it either exaggerated its ability to purchase properties in the Newark area or had no intention of using most of Plaintiffs' capital to make such purchases; (b) its access to outside financing was severely limited because Gelin, its Chief Executive Officer who controlled its funds and investments, had poor credit and a prior conviction for a multimillion-dollar mortgage fraud; (c) it did not work with Section 8 housing approved contractors that gave it access to properties at below market value; and (d) its team was headed by a convicted criminal fraudster

and did not include experienced contractors, real estate agents, and brokers based in the Greater New York Area.

144. Kensington, including Gelin and Edwards, knew that these representations were false or misleading but made them with the intention of inducing Plaintiffs to invest with Kensington and enter into the Joint Venture Agreements.

145. Plaintiffs executed the Joint Venture Agreements and invested in Kensington in justifiable reliance on Kensington's misrepresentations.

146. Plaintiffs have been damaged by Kensington's misrepresentations, as they would not have executed the Joint Venture Agreements and invested in Kensington but for these misrepresentations.

147. Business Buyers Club and Hernandez aided and abetted Kensington's fraud because they knew about the fraud and substantially assisted in its achievement. Plaintiffs issued the checks to Business Buyers Club when disbursing the loans to Kensington. A subsidiary of Kensington, Business Buyers Club was the owner of record of some of the properties acquired on clients' behalf. Hernandez owned and controlled Business Buyers Club with Gelin, and she guaranteed properties acquired on Plaintiffs' behalf.

148. Defendants' actions were willful and wanton, showing a conscious and deliberate disregard of Plaintiffs' interests. The imposition of punitive damages is therefore warranted.

**Count II**
**Breach of Contract**
**Against All Defendants**

149. Plaintiffs have performed all conditions, covenants, and promises required to be performed by Plaintiffs in accordance with the terms of the Joint Venture Agreements. Gelin and Edwards executed the Joint Venture Agreements on behalf of Kensington.

150.     Kensington materially breached the Joint Venture Agreements with Plaintiffs by: (a) using the loaned capital to acquire properties located outside New Jersey; (b) failing to make anywhere near the full repayment of the loans, including any interest and fees, by the Maturity Dates; (c) ceasing to make debt service payments on Plaintiffs' loans; (d) failing to fully reimburse Plaintiffs' fees and costs; and (e) failing to pay any late charges on the overdue amounts owed to Plaintiffs.

151.     Liability for Kensington's breaches of the Joint Venture Agreements extends to Business Buyers Club and Hernandez. The terms of the agreements provide that Kensington's obligations are binding on its agents, affiliates, and subsidiaries. Business Buyers Club was a subsidiary of Kensington and involved in the joint venture partnership with Plaintiffs. Business Buyers Club received the disbursement of Plaintiffs' loans to Kensington and was the owner of record of some of the properties that Kensington acquired on Plaintiffs' behalf. Hernandez was an agent of Kensington who owned and controlled Business Buyers Club, along with Gelin, and guaranteed properties acquired on Plaintiffs' behalf.

152.     As a direct and proximate result of Defendants' breaches of the Joint Venture Agreements, Plaintiffs have suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

153.     Rev. Jo has performed all conditions, covenants, and promises required to be performed by him in accordance with the terms of the Settlement Agreement. Gelin executed the agreement on behalf of Kensington.

154.     Kensington materially breached the Settlement Agreement with Rev. Jo by failing to pay the full settlement amount agreed on.

155.     As a direct and proximate result of Kensington's breach of the Settlement

Agreement, Rev. Jo has suffered, and will continue to suffer, monetary damages in an amount to

be proven at trial.

### Count III
### Breach of Implied Covenant of Good Faith and Fair Dealing
### Against All Defendants

156.     Plaintiffs have performed all conditions, covenants, and promises required to be

performed by Plaintiffs in accordance with the terms of the Joint Venture Agreements. Gelin and

Edwards executed the agreements on behalf of Kensington.

157.     Kensington materially breached its implied covenant of good faith and fair

dealing by unfairly interfering with Plaintiffs' rights to receive the benefits of the Joint Venture

Agreements by: (a) failing to make full repayment of Plaintiffs' loans more than two years after

their Maturity Dates; (b) failing to make debt service payments for more than a year-and-a-half;

(c) refusing to provide any accounting of how Plaintiffs' loaned capital was used, what specific

properties were acquired, and the status of those properties; (d) refusing to provide any schedule

for full repayment of Plaintiffs' loans, including all interest and fees, and reimbursement of all

costs and fees incurred; and (e) providing false or misleading explanations and excuses for the

many failures to perform under the Joint Venture Agreements.

158.     Liability for Kensington's breaches of the covenant of good faith and fair dealing

extends to Business Buyers Club and Hernandez. The terms of the Joint Venture Agreements

provide that Kensington's obligations are binding on its agents, affiliates, and subsidiaries.

Business Buyers Club was a subsidiary of Kensington and involved in the joint venture

partnership with Plaintiffs. Business Buyers Club received the disbursement of Plaintiffs' loans

to Kensington and was the owner of record of some of the properties that Kensington acquired

on Plaintiffs' behalf. Hernandez was an agent of Kensington who owned and controlled Business Buyers Club, along with Gelin, and guaranteed properties acquired on Plaintiffs' behalf.

159.     As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiffs have suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

**Count IV**
**Breach of Fiduciary Duty**
**Against All Defendants**

160.     Once Kensington executed the Joint Venture Agreements, it became a joint venture partner of Plaintiffs and was entrusted with the discretion to invest on behalf of Plaintiffs. Kensington thus owed Plaintiffs the duties of care, candor, and loyalty. These duties obligated Kensington to act reasonably and prudently in investing Plaintiffs' capital, disclose material information regarding the investments it made on Plaintiffs' behalf, and act in the best interests of Plaintiffs.

161.     Kensington breached its fiduciary duties of care and candor by: (a) making highly speculative and risky investments in Tennessee, outside its areas of expertise and competence; (b) failing to apprise Plaintiffs of these risks and obtain their informed consent before making such investments; (c) making these investments without having adequate funding to make debt service payments on Plaintiffs' loans, let alone make full repayments; (d) relying on an unqualified and patently untrustworthy agent to manage its investments in Tennessee, including sending Plaintiffs' capital to the agent without adequate safeguards; (e) failing to monitor and control its agent, rendering it vulnerable to embezzlement; (f) failing to inform Plaintiffs that Kensington believed that its agent had absconded with assets held by Kensington; (g) misleading Plaintiffs about the reasons that it could not make debt service payments; and (h) refusing to

provide any accounting of how Plaintiffs' loaned capital was used, what specific properties were acquired, and the status of those properties.

162.    Liability for Kensington's breaches of fiduciary duty extends to Business Buyers Club, a subsidiary of Kensington, and Hernandez, an agent of Kensington, both of whom knowingly participated in the breaches.

163.    As a direct and proximate result of Kensington's breach of its fiduciary duty, Plaintiffs have suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

**Count V**
**Negligence**
**Against All Defendants**

164.    After Gelin and Edwards executed the Joint Venture Agreements on behalf of Kensington, it was a fiduciary to Plaintiffs, and, accordingly, owed Plaintiffs a duty of care.

165.    Kensington breached its duty of care by: (a) making highly speculative and risky investments in Tennessee, outside its areas of expertise and competence; (b) making these investments without having adequate funding to make debt service payments on Plaintiffs' loans, let alone make full repayments; (c) relying on an unqualified and patently untrustworthy agent to manage its investments in Tennessee, including sending Plaintiffs' capital to the agent without adequate safeguards; (d) failing to monitor and control its agent, rendering it vulnerable to embezzlement.

166.    Liability for Kensington's negligence extends to Business Buyers Club, a subsidiary of Kensington, and Hernandez, an agent of Kensington, both of whom knowingly participated in the breaches of care.

167.    As a direct and proximate result of Kensington's negligence, Plaintiffs have suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

## Count VI
## Fraudulent Concealment
## Against All Defendants

168.     Throughout 2018-2020, Kensington made numerous representations about why it was not making debt service payments on Plaintiffs' loans and the investments it made on their behalf, including the statements in paragraphs 114, 116, 121, and 126 above.

169.     These representations fraudulently concealed that: (a) Kensington lacked any "backup funds" to finance its rehabilitation and development projects or to make debt service payments on Plaintiffs' loans; (b) due to Gelin's poor credit and criminal record, Kensington's access to outside financing was extremely limited; (c) Kensington had appointed McFarland, an unqualified, untrustworthy agent with an extensive criminal record whom Edwards met at a bar, to run Kensington's investments in Tennessee; (d) Kensington had sent Plaintiffs' capital to McFarland without adequate safeguards; (e) Kensington had failed to monitor its agent, rendering it vulnerable to embezzlement, and believed that its agent had absconded with assets; and (f) despite executing Promissory Notes and Guarantees, Gelin and Edwards either lacked the personal assets to repay the Songs' and Lucas-Barros's loans or had no intention to back their contractual obligations with personal assets.

170.     Kensington had a duty to disclose this material information because it owed fiduciary duties to Plaintiffs and a duty to speak truthfully and completely.

171.     Kensington knew that its representations misleadingly omitted material information but made them to induce Plaintiffs not to seek enforcement of the Joint Venture Agreements.

172.     Plaintiffs exercised forbearance in enforcing the Joint Venture Agreements in justifiable reliance on Kensington's misleading omissions.

173. Plaintiffs have been damaged by Kensington's misleading omissions, as they would have sought to enforce the Joint Venture Agreements but for the omissions.

174. Business Buyers Club, a subsidiary of Kensington, and Hernandez, an agent of Kensington, aided and abetted Kensington's fraud because they knew about the fraud and substantially assisted in its achievement.

175. Defendants' actions were willful and wanton, showing a conscious and deliberate disregard of Plaintiffs' interests. The imposition of punitive damages is therefore warranted.

**Count VII**
**Equitable Accounting**
**Against All Defendants**

176. In accordance with the Joint Venture Agreements, which entitles Plaintiffs to full repayments of their loans, including all interest, fees, and costs incurred thereon, and their share of profits from the disposition of any properties acquired on their behalf, Plaintiffs are entitled to an accounting from Defendants. Defendants are in the best position to know how Plaintiffs' loaned capital was used, the precise properties acquired on their behalf, the status of the properties acquired on their behalf, and the amounts of any profits due to Plaintiffs. The books and records necessary to make such determinations are in the possession, custody, and control of Defendants. The true and correct amounts due to Plaintiffs can only be ascertained by an accounting performed under the supervision of the Court.

## XI. Prayer for Relief

177. Plaintiffs pray for relief and judgment as follows:

a. compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

b. prejudgment interest;

c. punitive damages;

        d.      equitable accounting;

        e.      reasonable costs and expenses incurred in this action, including attorneys'

fees and costs; and

        f.      such other relief as the Court deems just and proper.

## XII.   Jury Trial Demanded

178.   Plaintiffs hereby demand a trial by jury.


Dated:     Los Angeles, CA             Respectfully submitted,
            February 1, 2021

                                        **CROWELL LAW FIRM**

                                        By: */s/ Joshua L. Crowell*
                                        Joshua L. Crowell (JC-0914)
                                        350 South Grand Ave. Suite 150
                                        Los Angeles, California 90071
                                        (213) 275-1432
                                        info@jlcrowell.com

                                        *Counsel for Plaintiffs*