# JOINT VENTURE AGREEMENT

This Joint Venture (the "Agreement") is made and entered as of this **4th** day of **April**, **4018** by and between **Kensington International, Inc.**, a Corporation formed under the laws of the State of New York ("KENSINGTON"), **Jigar Patel** ("Client"). KENSINGTON and Client are referred to collectively as the "Parties", and each individually as a "Party":

NOW, THEREFORE, in consideration of the premises and the mutual covenants, representations, warranties, conditions and agreements set forth herein, and intending to be legally bound hereby, the Parties hereto agree as follows:

**Section I: Loan**

1. Within three (3) days of the execution of this Agreement (as defined below), Client shall loan up to $265,000.00 (TWO HUNDRED SIXTY FIVE THOUSAND) US Dollars ("Loan") to KENSINGTON, which KENSINGTON shall deposit into a segregated account controlled by KENSINGTON or its subsidiary.
2. KENSINGTON shall use the Loan to acquire, renovate and dispose of 1 multifamily property in New Jersey as more particularly described on Exhibit D attached hereto, including the payment of any deposits, legal fees, contractors, and other real estate fees associated with the acquisition, renovation or disposition of the Properties (the "Purpose").
3. Unless otherwise agreed to by the Parties, the Loan may only be used for the Purpose.

**Section II:  Loan Repayment**

1. Notwithstanding anything to the contrary contained herein, KENSINGTON shall be responsible for the repayment of the principal amount of the Loan as well as any interest, origination costs, late fees, or other fees and costs due thereon until the Loan has been repaid in full ("Repayment"). In connection with such Repayment, KENSINGTON shall execute all necessary documents needed to evidence its Repayment obligation including, but not limited to, a promissory note in the form attached hereto as Schedule 1 and a guarantee in the form attached hereto as Schedule 2.
2. KENSINGTON shall, set aside at least ten percent (10%) of the Loan in a segregated bank account or subaccount owned and controlled by KENSINGTON or its subsidiary, for the sole purpose of making payments on the debt service of the Loan.
3. KENSINGTON shall, set aside an additional fifteen percent (15%) of the Loan in a segregated bank account or subaccount owned and controlled by KENSINGTON or its subsidiary, for the sole purpose of covering all administrative expenses involved with the Purpose. Administrative expenses shall be defined as the expenses that KENSINGTON incurs directly tied to the Purpose, such as, but not limited to, Salaries of senior executives, costs of general services such as accounting, appraisals, and inspections.
4. promissory note executed in connection herewith, KENSINGTON shall repay the principal, interest, other costs, (or any portion thereof) of the Loan within 72 hours of such principal, interest and other costs (or any portion thereof) of the Loan becoming due until the Loan has been repaid in full.
5. KENSINGTON shall repay, (a) at least 50% of the Loan's outstanding principal amount along with any interest accrued thereon and any fees incurred within five (5) days of the earlier of the first refinancing or first disposition of the Property purchased using the proceeds of the Loan ("First Refinancing"), and (b) the remainder of all the Loan's outstanding principal, interest accrued and fees incurred within five (5) days of the second refinancing or second disposition of a Property purchased  using the proceeds of the Loan.  Notwithstanding anything to the contrary contained

herein, the principal amount along with any and all interest accrued thereon, fees and any other lost shall be due on the one (1) year anniversary of the execution of this Agreement ("Maturity Date").

**Section III: Indemnity:** KENSINGTON hereby agrees to indemnify the Client and hold them harmless from any loss, liability, claim, damage, cost or expense (including reasonable legal fees and expenses and all other costs and expenses incurred in investigating, preparing for or defending any proceeding, commenced or threatened, incident to the foregoing or to the enforcement of this Section IV) suffered or incurred by Client for or on account of or arising from or in connection with (i) any breach of any provision of this Agreement, and (ii) the Loan.

**Section IV: Notice:** All notices or other writings required by this Agreement shall be given via U.S. Mail, overnight mail service or email to the following notice-addresses:

Kennsington Capital Group: One Gateway Center, Suite 2600, Newark, NJ 07102, Attn: John Gelin

**Section V: Severability:** The provisions of this Agreement are severable in the event that any provision hereof is held invalid, void, or otherwise unenforceable by a court of competent jurisdiction, and the remaining provisions will remain enforceable to the fullest extent permitted.

**Section VI: Counterparts:** This Agreement may be executed in duplicate counterparts with the same effect as if the signatures on each counterpart were upon a single instrument. All such counterparts, taken together, shall constitute the entire Agreement.

**Section VII: Binding:** This Agreement shall be binding on and inure to the benefit of the Parties and their officers, directors, shareholders, employees, agents, assigns, affiliates, subsidiaries, subrogees and/or subrogors, in their capacities as such, and such individuals' and entities' successors. This Agreement also shall apply to counsel and successor counsel for the Parties.

**Section VIII: Governing Law:** This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of law's provisions.

**Section IX: Modification:** This Agreement may not be amended or modified, in whole or in part, except by an instrument in writing duly executed by the Parties hereto.

**Section X: Authority:** Each Party hereto, through its representative, warrants that it is authorized to execute this Agreement. The Parties further represent that this Agreement has been duly executed and delivered on their behalf and constitutes their legal, valid, binding, and enforceable obligation.

**Section XI: Assignment:** This agreement may not be assigned by KENSINGTON without the consent of the Client.

**Section XII: Termination:** This agreement shall terminate upon the earlier of (a) the execution of the

Partnership Agreement incorporating the terms contained herein therein, (b) the repayment of the Loan by KENSINGTON and (c) a written termination agreement executed by all Parties.

**[Signatures to follow]**

**IN WITNESS WHEREOF, this Agreement has been executed and delivered in the manner prescribed by law as of the Effective Date first written below.**

        **KENSINGTON INTERNATIONAL, INC.**

        _____
        **Name: Eyan Edwards**
        **Title:**

        _____
        **Name: John Gelin**
        **Title:**

        _____
        **Name: Jigar Patel**
        **Client**

Schedule 1

PROMISSORY NOTE

AMOUNT: $265,000                                    DATE: April 4, 4018

                                                    CITY/STATE:  New York, NY


FOR VALUE RECEIVED, **Kensington International, Inc.**, a Corporation formed under the laws of the State of New York ("Debtor"), hereby promise to pay to the order of **Jigar Patel** ("Debtee") the principal sum, in lawful money of the United States of America, of TWO HUNDRED SIXTY FIVE THOUSAND DOLLARS AND ZERO CENTS (the "Aggregate Principal Amount"), plus interest as provided below.

1. Debtor hereby unconditionally promises to pay to Lender the Aggregate Principal Amount on or before the one-year anniversary of the above referenced date (the "Maturity Date").

2. In addition to the foregoing, Debtor hereby promises unconditionally to pay to Lender interest on the unpaid Aggregate Principal Amount from the date hereof until the Maturity Date in accordance with Schedule 1 attached hereto (the Aggregate Principal Amount, together with any interest accrued thereon, and any other amount due under this Note and/or the JV Agreement (as defined below), the "Indebtedness").

3. All payments are to be made at Lender's address listed above or at any other address as designated by Lender in writing from time to time.

4. Lender may declare the full amount of this Note due immediately if Debtor fails to pay, when due, any amount payable on any of Debtor's obligations under this Note. Without limiting the foregoing, if Lender has not received the full amount of any payment by the date it is due, Debtor shall pay a late charge on such overdue amount to Lender at a rate equal to the lesser of: (i) 6%, or (ii) the maximum rate allowable by law.

5. The Aggregate Principal Amount of this Note and any interest accrued thereon may be prepaid in whole or in part on the first day of any month prior to the Maturity Date, provided Debtor informs Lender in writing at the time of such payment that such payment is a prepayment of the Aggregate Principal Amount and any interest accrued thereon.

6. Upon the occurrence of Debtor's death, bankruptcy, general assignment for the benefit of creditors, or sale of the premises secured by the JV Agreement without the prior written consent of Lender, the unpaid balance of all amounts due hereunder shall be immediately due and payable, without notice or demand. The rights and remedies provided herein shall be cumulative and not exclusive of any rights or remedies provided by applicable law or otherwise.

7. Debtor hereby waives all notices and demands in connection with the delivery, acceptance, performance, default or enforcement of this Note, except as set forth herein. Lender does not have to present this Note, demand payment or protest.

8. It is hereby expressly agreed that the Aggregate Principal Amount shall become due at the option of Lender on the happening of any default or event by which, under the terms of the JV Agreement, the Aggregate Principal Amount may or shall become due and payable. All of the covenants, conditions and agreements contained in the JV Agreement are hereby made part of this instrument.

9. This Note is secured by the Amended and Restated Joint Venture Agreement (the "the JV Agreement"; capitalized terms used and otherwise not defined herein have the meanings specified in the JV Agreement) by and between Debtor and Lender, and executed contemporaneously herewith.

10. Debtor hereby covenants that it shall use any proceeds it receives from the refinancing and/or disposition of any Property (as defined in the JV Agreement) in accordance with the terms of the JV Agreement until the Indebtedness due hereunder is paid in full.

11. Delay or failure of Lender to take any action shall not prevent Lender from doing so later.

12. In addition to all other rights granted to Lender hereunder or under the JV Agreement, Lender shall be entitled to recover from Debtor all costs and expenses incurred (including, without limitation, reasonable attorneys' fees) in exercising Lender's rights or enforcing Debtor's obligations under this Note, which shall be added to and deemed a part of the Aggregate Principal Amount.

13. Debtor consents to and submits to jurisdiction over Debtor by any such court having jurisdiction over the subject matter, waives personal service of any and all process upon Debtor and consents that all such service of process may be by registered mail to Debtor at its address set forth above. Debtor further (a) agrees that any legal suit, action or proceeding arising out of or relating to this Note will be instituted exclusively in the courts of the State of New York sitting in the County of New York, or any Federal court in such State, (b) waives any objection which Debtor may have now or hereafter based upon forum non conveniens or to the venue of any such suit, action or proceeding, and (c) irrevocably consents to the jurisdiction of the State Courts located in said State in any such suit, action or proceeding.

14. Lender may transfer this Note. Debtor may not assign its rights or obligations under this Note.

15. Debtor has no offset, claim or defense against Lender, except for mismanagement of escrow funds mismanaged by Lender, if any.

16. This Note cannot be changed except in writing signed by Lender and Debtor.

17. This Note shall be governed by, and construed in accordance with, the laws of the State of New York. If any provision of this Note is found invalid, the remainder of this Note shall remain binding and effective. The doctrine of severability shall be applied.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned have executed the foregoing instrument as of the date above written.

**Kensington International, Inc.**

_____
Name: Eyan Edwards
Title:

_____
Name: John Gelin
Title:

Schedule 2

GUARANTEE

THIS GUARANTEE AGREEMENT, dated as of April 1, 4018 (this "**Guaranty Agreement**"), is made by John Gelin ("**Gelin**") in favor of the Jigar Patel (as defined below). Jigar Patel and such other holders being referred to collectively as the "**Holders**" and individually as a "**Holder**".

WHEREAS, Jigar Patel and Kensington International, Inc., a Corporation formed under the laws of the State of New York (the "**Company**"), has entered into that certain Joint Venture Agreement dated even date herewith (as amended or otherwise modified from time to time, the "**JV Agreement**"; capitalized terms used and otherwise not defined herein have the meanings specified in the JV Agreement); and

WHEREAS, in connection with the JV Agreement, the Company has executed that certain promissory note in the amount of $265,000 US Dollars dated even date herewith; and

WHEREAS, Section II (1) of the JV Agreement, contemplates the principals of the Company giving personal guarantees as surety for the Loan from Client to the Company.

NOW THEREFORE, FOR VALUE RECEIVED and in consideration of and in order to induce the execution of that certain (i) the Amended and Restated Joint Venture Agreement (the "the JV Agreement") by and between Company and Client, and executed contemporaneously herewith, and (ii) other good and valuable consideration:

1. The Guarantor hereby absolutely and unconditionally, guarantees to Holders, the due and punctual payment in full of (a) the principal of, interest on (including, without limitation, interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), and any other amounts due under, the Note when and as the same shall become due and payable (whether at stated maturity or by required or optional prepayment or by acceleration or otherwise) and (b) any other sums which may become due under the terms and provisions of the JV Agreement (all such obligations described in

2. clauses (a) and (b) above are herein called the "**Guaranteed Obligations**"). The guaranty in the preceding sentence is an absolute, present and continuing guaranty of payment and not of collectability and is in no way conditional or contingent upon any attempt to collect from the Company or any other guarantor of the Note (including, without limitation, any other Guarantor hereunder) or upon any other action, occurrence or circumstance whatsoever. In the event that the Company shall fail so to pay any of such Guaranteed Obligations, each Guarantor agrees to pay the same when due to the Holders entitled thereto, without demand, presentment, protest or notice of any kind. Each default in payment of any of the Guaranteed Obligations shall give rise to a separate cause of action hereunder and separate suits may be brought hereunder as each cause of action arises. THE OBLIGATIONS OF EDWARDS AND GELIN AS GUARANTOR HEREUNDER ARE THE JOINT AND SEVERAL OBLIGATIONS OF EACH OF THEM.

3. This Guarantee Agreement shall not be impaired by, and the Guarantor hereby consents to (i) any modification, supplement, extension or amendment of the JV Agreement or Note to which the Parties thereto may hereafter agree and (ii) any assignment of the JV Agreement or Note. The liability of the Guarantor hereunder is direct, unconditional and co-extensive with that of the Company and may be enforced without requiring Holder first to resort to any other right, remedy or security. The enforceability of this guarantee shall not be affected by any bankruptcy proceeding or other proceeding affecting the rights of creditors of Company, nor by discharge or modification of Company's liability under the JV Agreement or Note in any bankruptcy proceeding. An assignment of the JV Agreement or Note thereunder shall not release or relieve Guarantor from its liability hereunder. The Guarantor shall have no right of subrogation, reimbursement or indemnity whatsoever, nor any right of recourse to security for the debts and obligations of Company to Holder, unless and until all of said debts and obligations have been satisfied in full.

4. This guarantee is a joint and several continuing guarantee which shall remain effective during the term of all or any portion of the JV Agreement and/or Note, subject to any surviving provisions and obligations of the JV Agreement and/or Note that remain effective after the termination of the JV Agreement and Note.

5. Each Guarantor unconditionally waives to the fullest extent permitted by law,
6. notice of acceptance hereof, of any action taken or omitted in reliance hereon and of any defaults by the Company in the payment of any amounts due under the Note or the JV Agreement, and of any of the matters referred to in Section 1 or Section 2 hereof, (b) all notices which may be required by statute, rule of law or otherwise to preserve any of the rights of Holder against such Guarantor, including, without limitation, presentment to or demand for payment

7. from the Company or any Guarantor with respect to the, notice to the Company or to any Guarantor of default or protest for nonpayment or dishonor and the filing of claims with a court in the event of the bankruptcy of the Company or any Guarantor, (c) any right to the enforcement, assertion or exercise by Holder of any right, power or remedy conferred in this Guarantee Agreement, the JV Agreement or the Note, (d) any requirement for diligence on the part of any Holder and (e) any other act or omission or thing or delay to do any other act or thing which might in any manner or to any extent vary the risk of such Guarantor or which might otherwise operate as a discharge of such Guarantor.

8. Each Guarantor hereby guarantees that the Guaranteed Obligations will be paid to Holders in lawful currency of the United States of America and in immediately available funds, at the times and places provided in, and otherwise strictly in accordance with the terms and provisions of, the JV Agreement and the Note (regardless of any law, regulation or decree now or hereafter in effect which might in any manner affect the Guaranteed Obligations, or the rights of any such Holder with respect thereto as against the Company, or cause or permit to be invoked any alteration in the time, amount or manner of payment by the Company of any or all of the Guaranteed Obligations), without set-off or counterclaim and free and clear of, and without reduction for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions, withholdings now or hereafter imposed, levied, collected, withheld or assessed by any country (or by any political subdivision or taxing authority thereof or therein) excluding income and franchise taxes of the United States of America or any political subdivision, state or taxing authority thereof or therein

9. This Guarantee Agreement shall be governed by and interpreted in accordance with the laws of the State of New York, shall be deemed to have been made and performed in New York, and shall be enforceable in New York.

_____
Name: Eyan Edwards

_____
Name: John Gelin

Exhibit B

## I. Distributions in the event of the First Round Sale

Notwithstanding any other provision herein or elsewhere to the contrary, following the First Round Refinancing, the Partnership shall make its first distributions in the following order of priority:

A. first, to repay 100% of the Loan's outstanding balance including any interest accrued thereon as well as all late, fees, prepayment fees, and other fees and cost associated therewith;
B. then to the payment of the ordinary expenses of the Partnership; and
C. then the payment of distributions with 60% to be paid to KENSINGTON and 40% to be paid to Jigar Patel.

## II. Distributions in the event of Dissolution.

Notwithstanding any other provision herein or elsewhere to the contrary, following the decision to Dissolve the Partnership, the general partner shall sell all of its assets, and the Partnership shall make its first distributions in the following order of priority:

A. first, to repay any outstanding loan balances including any interest accrued thereon as well as all late, fees, prepayment fees, and other fees and cost associated therewith;
B. then to the payment any other outstanding liabilities of the Partnership; and
C. then the payment of distributions with 60% to be paid to KENSINGTON and 40% to be paid to Client

## III. Restrictions on Distributions.

(a) Partners shall have no right to demand and receive any Distribution from the Partnership in any form other than cash. No partner may be compelled to accept a Distribution of an asset in kind from the Partnership to the extent that the percentage of the asset distributed to such partner exceeds the percentage in which such partner is then entitled to share in Distributions from the Partnership. Any in-kind distributions of Partnership property shall be valued by an established, reputable, independent and qualified appraiser.

(b) A partner may not receive a Distribution to the extent that, after giving effect to the Distribution, the liabilities of the Partnership, other than liability to partners on account of their Capital Contributions, if any, would exceed the fair market value of the Partnership's assets.

Exhibit C

**Right of First Refusal for partnership Interest**.

- (a) <u>Initiation</u>. If at any time any partner (the "<u>Selling Partner</u>") desires to effectuate a Transfer other than a Permitted Transfer, and shall have received a bona fide written offer from any Person ("<u>Bona Fide Purchaser</u>") other than a partner or an Affiliate of a partner to purchase all or any portion of the partner's partnership interests, (the "<u>Offered Interest</u>"), then the Selling partner shall give written notice thereof (the "<u>Offered</u> <u>Interest</u> <u>Sale</u> <u>Notice</u>") to each partner, which Offered Interest Sale Notice shall set forth the identity of the Bona Fide Purchaser making the offer and the cash price at which Bona Fide Purchaser has offered to purchase such Offered Interest (the "<u>Offered</u> <u>Interest</u> <u>Terms</u>") free and clear of all liens, pledges, security interests and other encumbrances (other than liens incurred for the Partnership's benefit), and shall enclose a copy of the written offer offering such Offered Interest, at the price such Bona Fide Purchase offered to purchase the Offered Interest (the "<u>Offered Interest Price</u>").

- (b) <u>Partner</u> <u>Right</u> <u>of</u> <u>First</u> <u>Refusal</u>. Within fifteen (15) days of the giving of the Sale Notice, each non-selling partner (the "<u>Non-Selling</u> <u>Partners</u>") shall either (A) accept the offer contained in the Offered Interest Sale Notice and notify the Selling Partner of its intent to acquire of the Offered Interest according to the Offered Interest Price (an "<u>Offered</u> <u>Interest</u> <u>Acceptance</u> <u>Notice</u>") or (B) decline the offer (a "<u>Offered</u> <u>Interest</u> <u>Declination</u>"). A failure of any Non-Selling Partner to deliver an Offered Interest Acceptance Notice within said fifteen (15)-day period shall be deemed a Declination. If more than one Non-Selling Partner shall deliver an Offered Interest Acceptance Notice, then the Offered Interest shall be allocated among such Non-Selling Partners in proportion, as nearly as practicable, to the partnership interests then held of record by such Non-Selling Partners.

- (c) In the event of Offered Interest Declination, the Selling Partner, subject to <u>Section 13.</u>1 above, may proceed with the sale of the Offered Interest to Bona Fide Purchaser with the Terms at least equal to the Offered Interest Terms, so long as a closing takes place within four (4) months from the Declination date.

- (e) <u>Closing</u>. If a Non-Selling Partner delivers an Acceptance Notice to the Selling partner, such Non-Selling Partner shall have the right to designate the time, date and place of the applicable closing within the time period of no more than 45 days after the Acceptance Notice (provided, however, that to the extent the Offered Interest shall be sold to more than one Non-Selling Partner, the closing of such sale shall occur on such day mutually agreed to by the purchasing Non- Selling Partner. At the closing of the sale of the Selling Partner's Offered Interest (i) the Selling partner shall pay any transfer or similar taxes, other than income taxes arising out of such transfer, (ii) the Selling Partner's Offered Interest shall be free and clear of any liens, pledges, security interests and other encumbrances or any interests of any other Person (other than liens incurred by

       the Partnership), and (ii) the Selling partner shall execute any and all documents required to fully transfer good and clear title (other than liens incurred by the Partnership) to such interest to such Non-Selling Partner(s) and any other documentation reasonably required by such Non-Selling Partner(s).

As used herein, **"Permitted Transfers"** shall mean Transfers by a partner, its constituents or the direct or indirect holders of any interest therein, shall be permitted (any such transfer a "Permitted Transfer;" and any such transferee a "Permitted Transferee"):

    i)     Transfers by will or the laws of intestacy or to a trust or otherwise for the exclusive benefit of such transferor and/or such transferor's Immediate Family, and Transfers pursuant to the terms of any such trust, or

    ii)     Transfers to another partner, or

    iii)     Transfers to an Affiliate, (Affiliate shall mean, any entity in which a partner, or principal of a partner, or its stockholders own at least 51% of the beneficial interest) or

    iv)     Transfers to any personal representative upon incapacity.

Exhibit D

**Real Estate Strategy**

1. **Acquire, renovate and sell 1 property**

2. **Hard Loan Financing; Repayment**
   a. In connection with each acquisition of a Property, the KENSINGTON shall take out a hard money loan or loans in an amount equal to at least 60% of the purchase price for such Property ("Hard Money Loan").
   b. Prior to the disposition of the Property owned by KENSINGTON, KENSINGTON shall be responsible for the repayment of the principal amount of the Hard Money Loan as well as any interest, origination costs, late fees, or other fees and cost due thereon ("Hard Money Loan Repayment"), and Client shall have no responsibility for the Hard Money Loan Repayment.